1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10
11   ASA A. ALPHONSO,                    )     Case No. 14CV0884-L(JMA)
12               Petitioner,             )     **REPORT & RECOMMENDATION**
13   v.                                  )
14   SCOTT FRAUENHEIM, Warden,           )
15               Respondent.             )
16   _____ )
17

## I.    INTRODUCTION

Petitioner Asa A. Alphonso, a state prisoner proceeding *pro se* and *in forma pauperis* with a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenges his conviction in San Diego County Superior Court Case No. SCD235703 for nine felony offenses against Michelle C.[1] during two incidents consisting of two counts of corporal injury on a cohabitant, two counts of false imprisonment by violence, and one count each of assault by means of force likely to cause great bodily injury and assault with a deadly weapon, attempting to

---

[1]  In the interest of protective nondisclosure, the undersigned has adopted the California Court of Appeal's practice of referring to Michelle C. by first name.

dissuade a witness from reporting a crime, rape, and making a criminal threat.  (Lodgment No. 2, CT 179.) The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the Traverse, the lodgments, the record, and all the supporting documents submitted by both parties.  For the reasons discussed below, the Court recommends the Petition be DENIED WITH PREJUDICE.

## II.    FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. A federal habeas petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The following facts are taken from the California Court of Appeal opinion:

A.    *The People's Case*

Michelle testified that she met Alphonso through an online dating service as she was going through a divorce, and they had an "off and on" two-and-a-half-year relationship that ended in July 2011. The two were cohabitating at her apartment in San Diego at the time the crimes were committed in this case. Alphonso was nice and friendly when their relationship started, but he became verbally and physically abusive over time. He accused Michelle of dating other people and called her names like "[w]hore, slut, bitch, [and] stupid."

Alphonso first used physical violence against her after about a year, when he grabbed her arm in her bedroom, twisted her hand behind her back, and pushed her neck and head forward, causing her head to hit a bench. Alphonso apologized, and Michelle stayed with him because she believed he was sorry and would not do it again.

Thereafter, for more than half a year, Alphonso verbally abused Michelle, but did not physically abuse her. Although she tried to break up with him many times, she would end up reconciling with him when he was nice to her.

After they broke up in February 2011, Alphonso sent texts and phone messages to Michelle in which he threatened to ruin

her by sending naked photographs of her to her mother, children and family. He then posted naked photographs of her on Craigslist. Michelle called the police and also called Craigslist to have them remove the photographs. She reconciled with Alphonso about a month later because he apologized to her, she loved him, and she hoped they could stay together. However, Alphonso resumed the physical and verbal abuse.

Michelle testified that Alphonso held her hostage in February 2011. She tried to leave her apartment when Alphonso became very angry, but he grabbed her, pushed her back inside, and locked the door. When she then tried to leave through the sliding glass door, he again grabbed her, pushed her back inside, locked that door, shut the curtains, turned up the music, and told her, "That's so nobody can hear you screaming." Michelle stayed on the couch for several hours and did not call for help because Alphonso was angry and violent, and she did not want to get hurt. Alphonso eventually calmed down and apologized. Michelle did not call for help because she believed Alphonso would kill her if she did so.

*Counts 1-5 and 9*

On July 19, 2011 – the date of the first incident on which counts 1-5 were based in this case[2] – Alphonso again held Michelle hostage, this time in her bedroom for nine hours. She testified she had been sick and was lying down on her bed in the afternoon when Alphonso arrived. He was angry that she was still lying down and accused her of being up all night sleeping with other men. He yelled at her, spat on her, and called her names. Michelle tried to escape through the door before Alphonso got too angry, but he grabbed her, pushed her, told her to return to the bedroom, and locked the door. Alphonso told her to stay on the bed and took her phone. When Michelle's mother called her, Alphonso answered the phone and told her Michelle was a bad person.

During this incident, Alphonso kicked Michelle's leg, causing bruising and swelling. He also hit her calf where he had recently tattooed his first name even though she was reluctant for him to do so. The tattoo was infected, red and swollen. Alphonso also hit her head and face with an open hand 20 to 30 times, hit her in the head with the remote control, grabbed her hair and banged her forehead against the wall, and twice cut off her breath by smothering her with a pillow. When Michelle went to the bathroom, Alphonso grabbed her hair, took a knife out of a drawer, held it against her temple, and told her to look at the knife because he was going to kill her with it. Alphonso also threatened to kill her when she was on the bed.

---

[2]  The information charged Alphonso in counts 1 through 5 with corporal injury on a cohabitant, false imprisonment by violence, assault with a deadly weapon, assault by means of force likely to cause great bodily injury, and attempting to dissuade a witness, respectively, and alleged he committed these offenses on or about July 19, 2011.

He restrained her by holding her arms against the bed and sitting on her legs.

After the ordeal, Michelle had bruises and lumps all over her forehead and bruising around her eyes from being hit in the eye with the hard part of a stuffed animal. She testified she did not leave after Alphonso calmed down because he threatened to kill her if she left or tried to get help.

The next day, Michelle cancelled her appointment with her therapist, Sandra Gorchow, because Alphonso did not want Gorchow to see Michelle's bruised eye.

### Counts 6-9

The second incident– on which counts 6-9 were based[3] – occurred on July 21 or 22 and lasted about six hours. Alphonso again accused Michelle of sleeping with other men. She testified that when she saw him getting angry, she thought, "Here it goes again." She did not try to leave, and she complied when Alphonso told her to get on the bed. He told her he was going to burn her with cigarettes. He went outside to get the cigarettes because she did not allow smoking inside the apartment. She could have locked him out on the balcony when he went to get the cigarettes, but she did not do so. Michelle testified that when Alphonso returned, he lit a cigarette, sat on the bed, grabbed her legs, pulled them over to him, and "started burning [her] feet and upper–or lower part of [her] right leg." He burned her eight times and it was very painful.

Michelle also testified that Alphonso threatened to kill her "many times" that day. He threatened to put a wet towel over her, tie her up, and let the cats eat her. He talked about slashing her face, knocking her teeth out, peeling her fingernails back, and breaking her fingers. Alphonso repeatedly hit her on the head with the remote control and with his hand. Toward the end of the six-hour incident, Alphonso told Michelle he was going to rape her, ordered her to remove her clothes, and then engaged in forcible sex with her, causing her pain.

### Reporting of the Incidents

A few days later, Michelle went to an appointment with her therapist. She put makeup on her facial injuries so that her therapist would not see them, but she did not cover up the cigarette burns. Michelle did not disclose the domestic violence to her therapist because she knew the therapist would call the police; and Michelle feared Alphonso would kill her.

At the end of the session, the therapist suggested that she meet with Alphonso and explain to him that it was

---

[3]  The information charged Alphonso in counts 6 though 9 with corporal injury on a cohabitant, false imprisonment by violence, forcible rape, and making a criminal threat, respectively, and alleged he committed these offenses on or about July 21 and 22, 2011.

appropriate for her to work with him and Michelle for couple's therapy. Michelle texted Alphonso about meeting with the therapist, and she and her therapist picked up Alphonso and drove him to Michelle's apartment to talk.

When the three arrived at the apartment, the therapist started talking about couple's therapy. The therapist testified that Alphonso "became exceptionally animated," angrily paced around, and almost berated her. The therapist eventually told Michelle and Alphonso she had to leave.

Michelle walked with her therapist to the therapist's car, started crying, and said, "I'm not going to go back in there" or "I can't go back in there." The therapist told her to get in the car, and she did. Alphonso approached the car and asked, "Why are you doing that? Don't get in the ... car. Why do you want her in the car? Where are you taking her? We can talk." Alphonso was standing in front of the car and leaning on the hood. When he moved to the side, the therapist drove the car away.

After they drove away, Michelle started telling the therapist about what had happened and said Alphonso would kill her if the therapist called the police. Michelle showed her the bumps and bruises she had covered with makeup and the cigarette burns on her ankle and foot. She had her therapist feel the bumps on her scalp.

The therapist called 911 when Michelle went to the bathroom at a store. When Michelle returned to the car, the therapist was still on the phone with the 911 dispatcher. After the call, the two sat in the car until the police arrived. The therapist spoke with them first, and then Michelle reluctantly spoke to them. The therapist testified that Michelle appeared to be extremely fearful.

San Diego Police Officer Steve Sdringola testified he responded to the 911 call. Michelle initially did not want to talk to him. Officer Sdringola accompanied the two women back to the victim's apartment. Michelle told him she and Alphonso had been together for two and a half years and that in the last six months there had been at least 10 incidents of physical abuse by Alphonso. She told him in particular about the two incidents on July 19 and July 21 or 22. However, she did not tell him that Alphonso had raped her, and she made no mention of Alphonso's alleged threats to starve her and let her cats eat her, or break her fingers, or smother her with a wet towel, or slash her face. At trial, Michelle indicated she did not provide as much information as possible to the officer because she still feared Alphonso and she was protecting him for his sake and hers.

Officer Sdringola testified he saw eight small, round burn marks on Michelle's foot; and also saw raised bumps and bruising on her head. Another officer photographed the injuries.

1
2
3
4
5
6
7

A clinical psychologist with the San Diego Family Justice Center testified about the cycle of abuse in domestic violence, which starts with the "honeymoon" phase, proceeds to the tension-building phase, escalates to the acute battering phase and repeats. To maintain power and control, batterers may engage in intimidation and emotional abuse, may isolate the victim, may minimize or deny the abuse and blame others for their own behaviors, may use children, and may use coercion and threats. As defense mechanisms, victims may minimize, rationalize, or justify the abuse to stay in the relationship. The psychologist testified it is difficult for victims of abuse to speak out about sexual violence in the relationship.

8
9

The parties stipulated that Michelle mentioned for the first time at trial two specific prior acts of domestic violence in which Alphonso pushed her, took her keys, and pushed her against a wall.

10

B.   *The Defense Case*

11
12
13
14
15
16

Alphonso's defense was that Michelle was lying and he did not commit any of the charged crimes. Two residents of the apartment complex where Michelle lived testified they did not hear any loud arguments at the complex in July 2011. Also, a witness who performs computer and telephone forensic evaluations testified that he examined phone records for the month of July 2011 for a phone number assigned to Michelle. Michelle's cell phone records indicated several calls were made from and received on her cell phone on July 19, 21 and 22, including incoming and outgoing calls to her mother and sister.

17

(Lod. 6, pp. 4-11.)

18

**III.   PROCEDURAL BACKGROUND**

19

A jury found Alphonso guilty of two counts of corporal injury on a

20

cohabitant, two counts of false imprisonment by violence, and one count

21

each of assault by means of force likely to cause great bodily injury and

22

assault with a deadly weapon, attempting to dissuade a witness from

23

reporting a crime, rape, and making a criminal threat. True findings were

24

made by the jury that, as to the corporal injury charge, Alphonso personally

25

used a dangerous weapon. (Lod. 2; CT 10-13, 220-28.) On the same day,

26

Alphonso admitted he had three prior prison term convictions, and two prior

27

strike convictions. (CT 229.) The trial court sentenced him to fifty years to

28

life plus six years. (CT 241-244.)

1    Thereafter, Alphonso initiated a direct appeal of his conviction

2  arguing: 1) the trial court erred when it denied Alphonso's *Batson/Wheeler*[4]

3  objection and determined he had not made a prima facie showing that the

4  prosecutor exercised four of her peremptory challenges based on race; 2)

5  the trial court abused its discretion in denying his motion for a new trial

6  based on the newly discovered evidence that Michelle had made false

7  allegations that her husband physically and sexually abused her; 3) the

8  denial of the motion for a new trial also denied his right to present a

9  complete defense in violation of the Fifth, Sixth and Fourteenth

10  Amendments to the U.S. Constitution; 4) the denial of the motion for a new

11  trial was prejudicial under *Chapman v. California*, 386 U.S. 18 (1967); and

12  5) Alphonso's sentences on various counts should have been stayed

13  pursuant to California Penal Code section 654. (Lod. 3.) On August 27,

14  2013, the California Court of Appeal issued an opinion affirming the

15  convictions, but staying the concurrent sentences for six of his convictions.

16  (Lod. 6.) Alphonso's petition for review in the California Supreme Court,

17  case S213605, raising the first three claims (Lod. 7), was denied without

18  comment on November 20, 2013 (Lod. 8.).[5]

19    Alphonso filed his Petition for Habeas Corpus Relief pursuant to 28

20  U.S.C. § 2254 in this Court on April 14, 2014. [Doc. No. 1.]  Respondent

21  filed an Answer on June 3, 2014. [Doc. No. 11.] Alphonso filed a Traverse

22  on June 14, 2014. [Doc. No. 15.]

23  / /

24  / /

---

25

26    [4] *Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure
under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis
27  that the strikes are being made on a discriminatory basis, i.e., because they are members of
an identifiable group distinguished on racial, religious, ethnic, or similar grounds); *People v.*
28  *Wheeler*, 22 Cal. 3d 258 (Cal. 1978).

    [5] Alphonso did not file any state habeas corpus petitions.

7

## IV.     DISCUSSION

Alphonso raises four claims in his Petition.  First, he claims the state trial judge abused his discretion in denying Alphonso's motion for a new trial based on newly discovered evidence. [Doc. No. 1, Pet. 31-34 (of 75).] Second, he argues his right to a fair trial was violated when the trial court precluded him from presenting testimony to impeach that offered by Michelle and denied his motion for a new trial. [*Id.*, 34-38.]  Third, Alphonso claims the prejudice for these two errors should be assessed under *Chapman.* [*Id.*, 39-41.]  Lastly, he claims the trial court infringed his federal constitutional rights when it denied his *Batson/Wheeler* motion and did not find the prosecutor improperly used peremptory challenges to exclude all non-white jurors. [*Id.*, 41-45.]

### A.     Standard of Review

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions, but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the

governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at 72.

## B.   Claims 1 - 3, Denial of Motion for New Trial

Alphonso's first three claims relate to the trial court's denial of his motion for a new trial based on newly discovered evidence. Specifically, he claims: 1) the trial court abused its discretion in denying the motion; 2) the denial of the motion in limine to call Michelle's estranged husband as an impeachment witness and the denial of the motion for a new trial violated Alphonso's constitutional right to present a defense; and 3) the prejudice of these two errors should be assessed under *Chapman*.

### 1.   Background

The following facts relevant to Alphonso's first three claims are taken from the California Court of Appeal opinion:

1.   *Alphonso's Motion in Limine*

Alphonso moved in limine to be allowed to call Michelle's then-husband (husband) to testify that she had previously made false accusations that her husband abused her. At the hearing on the motion, defense counsel indicated Michelle and her husband were still married, but they were separated and dissolution proceedings had been ongoing for several years, and the husband would testify that he was in the United States Navy and that Michele had falsely accused him – both to Navy authorities and in the dissolution proceedings – of domestic violence against her and sexual abuse of their child.

The prosecutor acknowledged evidence of false allegations "can be admissible," but argued Michelle denied the allegations were false and opposed the admission of her husband's testimony because it was more prejudicial than probative and it was "going to be time-consuming." The prosecutor had just received "the majority of documents relating to this," and she did not foresee this would be an issue in this case. She had also recently requested the family advocacy file under the Freedom of Information Act, but she was not certain she would receive the information before the trial began. Noting that Michelle and her husband had been married for 27 years, the prosecutor stated, "In reading through the divorce affidavits from both parties, there is a lot of meat on this bone."

Defense counsel stated he intended to limit the scope of husband's testimony to "the fact [Michelle] falsely accused him," and he would not seek to introduce evidence about

"who's a good parent and who's a bad parent" or whether the children did not like to spend time with the victim. The court observed it was "in a bit of a vacuum," recognized the potential relevance of evidence that "any victim made what turned out to be false accusation of domestic violence," and deferred ruling until the husband could be examined at a separate hearing.

2.    *Evidence Code Section 402 Hearing and the Court's Ruling*

After the prosecution rested its case, and outside the presence of the jurors, defense counsel reiterated that in 2007 Michelle falsely accused her husband of physically and emotionally abusing her and sexually molesting their daughter. Defense counsel acknowledged that if the husband were to testify the allegations were false, the prosecutor would call Michelle to testify to the contrary.

When the court stated that "we have some proceedings that occurred with the United States Navy that at least at some point led to counseling of the [husband]," defense counsel replied, "Yes." The court indicated it was inclined to exclude the husband's testimony, stating it was "left with... a 'he said she said'" and there was "some type of concession by the [husband] that something was going on, at least inferentially, by his accepting the [Navy's] counseling program."

The court then heard the testimony of the husband out of the presence of the jurors at a hearing conducted under Evidence Code section 402. The husband, a retired Navy Commander, testified he married Michelle in 1991 and they separated in 2007. They started divorce proceedings in 2009, but the divorce was still not final. They were the parents of a 17-year-old son and a 15-year-old daughter.

In 2007 Michelle accused her husband of mental, sexual, financial, and physical abuse, and the allegations were handled through the Navy arbitration system. The husband learned during the dissolution proceedings that Michelle had reported to Child Protective Services that he had sexually molested their daughter, but the matter had been dismissed as unsubstantiated.

The husband testified Michelle falsely alleged he mentally abused her when they got into arguments regarding the handling and care of their children. Her sexual abuse claim was based on her belief they should not have sex when he was on medication. She had been on various medications since 2000. Michelle alleged he had sex with her without her consent when she was medicated. The husband denied he ever did so. He said he initially refused her requests for sex when she first started taking the medications. After she "got normalized" with the medications, he acquiesced and had sexual relations with her.

He also testified Michelle's financial abuse claim

11

stemmed from his decision to take over the family's bills after she failed to pay them on time and bounced checks. He indicated he thought Michelle's physical abuse claim was probably related to her sexual abuse claim and stated that "when the sexual one didn't pan out... she claimed again later for physical abuse." The husband also testified about an incident in which Michelle took the laptop he needed for work out of his car, they had a tug of war in which Michelle took the laptop he needed for work out of his car, they had a tug of war with the computer, and, when she tired he took her hands off the computer, put it in the car, shut the door and left. He denied physically abusing her.

The husband testified that after the third or fourth "episode of an allegation," he asked the Navy mediators how he could bring it to an end. He was fearful it would hurt his career and wanted to stop it before he was up for promotion to captain. The mediators advised him he could take a 16 week course called the Cypress Men's Group. The husband asked what he needed to do to get in to the course, and the mediators told him that if they found substantiation for a claim, they would recommend him for the group. He then substantiated the mental abuse claim by stating he probably did get angry and was loud and that was probably stressful for Michelle. The husband thought she made another allegation of mental abuse after he completed the program. Michelle never told the police that he forced her to have sex or was violent with her.

The husband acknowledged the Naval Advocacy Committee substantiated the mental abuse claim in August 2007. He also testified that if Michelle said he kissed his daughter on the back of her head when she was sleeping and patted her butt when she was sleeping and awake, this would be true but he did not consider it to be sexual abuse. He acknowledged that the Naval Family Advocacy committee contacted him because of his alleged emotional abuse and controlling behavior and that the majority of the interactions between Michele and the committee revolved around these subjects.

### a.    Ruling

After the husband testified, the court excluded his testimony. The court stated that although the husband was "a highly credible witness," his testimony "would not provide the jury with any relevant facts at this point," and found his testimony had "no probative value."

### 3.    Alphonso's motion for a new trial, the FAP records, and the court's ruling

After the jury returned its guilty verdicts, Alphonso moved for a new trial based on newly discovered evidence, namely records obtained through discovery from the Navy's Family Advocacy Program Case Review Committee's investigation (the FAP records) that the prosecutor had requested at the start

of the trial, which the prosecutor received and provided to the defense after the jury returned its verdicts. In his motion, Alphonso asserted the FAP records were relevant to the issue of whether Michelle previously had made false accusation(s) of physical abuse because they showed that she had alleged her husband punched her, threw her against a wall, and pushed and shoved her; that she reported she did not have a car because she believed her husband would cut the brake lines if she had one; that she accused her husband of sexual abuse; and that she claimed he abused her an average of three times a month. Alphonso pointed out that the husband, during his testimony at the Evidence Code section 402 hearing, testified he never physically or sexually abused Michelle, but the court denied the defense request that the husband be allowed to testify about these allegations.

In her opposition to the new trial motion, the prosecutor argued the new evidence was cumulative to the evidence produced in discovery and presented at trial. Specifically, the prosecutor argued the family court records provided to defense counsel before trial included a November 2009 declaration in which Michelle claimed her husband had been violent with her in the past, the Navy found him guilty of domestic violence, she stopped driving shortly after she got married because of her husband's negative comments about her driving, she never drove again because of her husband's comments about damage he had done to other people's cars when he became upset with them, and her husband had a way of threatening her without actually doing so.

The prosecutor also represented that in an April 2010 declaration Michelle stated concern about her husband "inappropriately" kissing their daughter on the neck while the daughter slept and tapping her daughter's buttocks when she walked near him. In addition, the prosecutor argued the husband's declarations described three domestic violence allegations Michelle made to the Navy, only one of which was substantiated; and in interviews with the defense the husband stated that Michelle had called Naval Family Advocacy five or six times to complain he was mentally abusive to her.

In her opposition, the prosecutor also asserted that the "voluminous" FAP records produced by the Navy covered the same information contained in the family court records, the husband's statement, and his testimony. The prosecutor summarized the two referrals to the Family Advocacy Program and stated that the FAP records indicated that – in the first case, which was substantiated for emotional abuse– Michelle claimed her husband would come into her room after she had taken her sleeping pills and have sex with her without her consent; and, regarding physical abuse, she stated her husband had hit her one time many years earlier.

In the second case, which was not substantiated, Michelle spoke to a caseworker who referred the case for investigation of ongoing emotional abuse and control. Michelle

13

told the caseworker that she lived in a separate home from her husband and that she feared her home might be bugged because her husband repeated things that she had said when he was not there. She said her husband controlled the finances at both homes and used the children to monitor her activities. During the risk assessment with a clinical provider, Michelle was asked for a history of abuse, and she responded that her husband had "punched her, thrown her into walls, grabbed and pushed her and would then act as if it were an accident (for example accidently hitting her in the face with his elbow) or completely deny that anything had happened." Michelle said the physical abuse occurred about three times a month and stopped when they separated 18 months earlier. She also mentioned she feared that if she owned a car, her husband would do something to it, like cutting the break *(sic)* lines. She said her husband had made statements in the past about what he had done to other cars belonging to people with whom he was angry, like "they'll never drive that car again[.]"

The prosecutor also argued Alphonso's new trial motion should be denied because (among other things) impeachment evidence does not provide a basis for a new trial.

## a. Ruling

At the hearing on the new trial motion during the sentencing proceeding, the parties agreed to submit four pages of the voluminous FAP records to the court under seal. After listening to the parties' arguments, the court ruled that defense counsel had exercised due diligence, but "to a large extent" the material was cumulative to what was previously available to both counsel, and the resolution of what happened between Michelle and her husband starting years earlier was just not "that probative to the issues" in the case. The court stated it was confident there [was] no reasonable probability that had this information been available and even had it been presented to a jury that it would have resulted in a different result." Accordingly, the trial court denied the new trial motion.

(Lod. 6, pp. 21-28)

## 2. The California Court of Appeal Decision

The California Supreme Court denied Alphonso's three claims predicated on the trial court's denial of his motion for a new trial without citation of authority so this Court must "look through" that denial to the Court of Appeal's opinion. *Ylst*, 501 U.S. at 801-806. The Court of Appeal simultaneously addressed these three claims as follows:

Here, we cannot say the court abused its broad discretion by denying a new trial. Assuming for purposes of discussion that the other factors discussed in *Delgado*, *supra*, 5 Cal. 4th at

14

page 328 are satisfied, Alphonso has not shown, and cannot demonstrate, a reasonable probability the newly discovered evidence would result in a different result on retrial.

"[W]hen a defendant makes a motion for a new trial based on newly discovered evidence, he has met his burden of establishing that a different result is probable on retrial of the case if he has established that it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented." (*People v. Soojian* (2010) 190 Cal. App. 4th 491, 521.)

Here, Alphonso asserts in a conclusory fashion, without addressing the strong evidence of his guilt presented at trial, that "[i]t is highly likely -–certainly more than probable—that at least one juror would have been [*sic*] entertained a reasonable doubt that [Michelle's] reports of [Alphonso's] alleged attacks were believable, after hearing the testimony of a 'highly credible' (the trial court's words) former Navy officer about her prior false claims." We disagree. Michelle's trial testimony regarding Alphonso's conduct was corroborated not only by the testimony of Michelle's therapist Sandra Gorchow and Officer Sdringola, but by the photographs that another officer took of the injuries Michelle suffered when Alphonso burned her with a cigarette.

Specifically, Gorchow testified that after Michelle, who was scared, started telling her in the car about what had happened, Michelle showed her both the bruises she had covered with makeup and the cigarette burns on her ankle and foot, and she also had Gorchow feel the "raised bumps" on her scalp. Gorchow testified she called 911 after Michelle got out of the car and went into the bathroom at a store.

Officer Sdringola, who responded to that call, also corroborated Michelle's testimony by testifying that Michelle told him about what had happened during the two incidents. Officer Sdringola testified he saw eight small, round, apparent burn marks on Michelle's foot and also saw raised bumps and bruising on her head. He stated that another officer photographed the injuries.

Due to the strength of the victim's testimony, as corroborated by the testimony of Gorchow and Officer Sdringola and the photographic evidence of her injuries, we conclude Alphonso has failed to meet his burden of showing it is probable that at least one juror would have voted to find him not guilty had the new evidence been presented. Accordingly, we reject Alphonso's claims that the court abused its discretion and violated his constitutional right to present a defense by denying his motion for a new trial.

(*Id.*, pp. 29-31.)

### 3.    Claim 1 – Abuse of Discretion

Relying only on California law, Petitioner contends the trial court abused its discretion in denying his motion for a new trial. [Doc. No. 1, pp. 31-34 (of 75).] This claim is not cognizable on federal habeas review. Federal courts may grant a writ of habeas corpus only if the petitioner's conviction or sentence is in "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  Alphonso's abuse of discretion claim is supported solely by California law in his Petition. [Doc. No. 1, pp. 31-34 (of 75).] In his Traverse, he attempts to transform his state law claim into a federal one with a passing reference to the Due Process Clause. [Doc. No. 15, p. 4 (of 10)].  The Ninth Circuit has repeatedly held that a habeas petitioner's mere reference to the Due Process Clause is insufficient to render his claims viable under the Fourteenth Amendment. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir.1994); *Miller v. Stagner*, 757 F.2d 988, 993-94 (9th Cir.1985). Here, the right that Petitioner seeks to enforce, his state statutory right to a new trial, emanates from state law. Consequently, his claim is not cognizable on federal habeas review. *See also Washington v. Horel*, 2008 WL 4427221, at *4 (C.D. Cal. Sept .30, 2008) (holding that claim of abuse of discretion in denying new trial is not cognizable in federal habeas proceedings where the petitioner identifies no constitutional right that was violated and instead relies solely on California state law and claims the trial court abused its discretion under such law).

### 4.    Claim 2 – Denial of Right to Present a Defense

In his second claim, Alphonso contends the denial of his motion in limine to call an impeachment witness and motion for a new trial based on newly discovered impeachment evidence resulted in the denial of his

Constitutional right to present a complete defense.  As a threshold matter, the Court notes that although the claim Alphonso presented to the California Supreme Court discusses the trial court's preclusion of the estranged husband's testimony, he does not appear to have specifically argued the denial of the motion in limine violated his right to present a complete defense and instead focused on the denial of the motion for a new trial. (Lod. No. 7, pp. 16-24.) Irrespective of whether this aspect of Petitioner's right to present a complete defense claim has been properly presented to the state courts, the Court may deny it on the merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Acosta–Huerta v. Estelle*, 7 F.3d 139, 142 (9th Cir.1992) (holding that a district court can reach the merits of an unexhausted claim under § 2254(b) (2) when the Court determines it does not present a colorable claim for relief). Petitioner is not entitled to habeas relief as to this aspect of his right to present a defense claim because, for the reasons set forth below, he does not present a colorable claim for relief. *Hill*, 474 U.S. at 58–60; *Strickland*, 466 U. S. at 694; *Tollett*, 411 U.S. at 267; *McMann*, 397 U.S. at 771.

A criminal defendant has the fundamental right to present a defense and to present witnesses.  For more than fifty years, the Supreme Court has clearly and repeatedly articulated these core constitutional guarantees. In 1948, Justice Black, writing for the Supreme Court, declared that a defendant's "right to his day in court" is "basic in our system of jurisprudence" and includes "as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." *In re Oliver*, 333 U.S. 257, 273 (1948) (emphasis added). Since then, the Supreme Court has again and again noted the "fundamental" or

"essential" character of a defendant's right both to present a defense, *Crane v. Kentucky*, 476 U.S. 683, 687, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972); *Washington v. Texas*, 388 U.S. 14, 19 (1967), and to present witnesses as a part of that defense. *Taylor v. Illinois*, 484 U.S. 400, 408 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Webb*, 409 U.S. at 98; *Washington*, 388 U.S. at 19.

The U.S. Supreme Court has variously stated that an accused's right to a defense and right to present witnesses emanate from the Sixth Amendment, *Taylor*, 484 U.S. at 409; *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), the Due Process Clause of the Fourteenth Amendment, *Rock*, 483 U.S. at 51; *Trombetta*, 467 U.S. at 485; *Chambers*, 410 U.S. at 294; *Webb*, 409 U.S. at 97; *Oliver*, 68 S.Ct. at 507, or both. *Crane*, 476 U.S. at 690; *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); *Washington*, 388 U.S. at 17-18.  The Sixth Amendment source of these rights is the Compulsory Process Clause, which embraces "the right to have the witness' testimony heard by the trier of fact." *Taylor*, 484 U.S. at 409.  *Washington* formally incorporated the Compulsory Process Clause into the Due Process Clause of the Fourteenth Amendment. 388 U.S. at 17-19.  As the Supreme Court stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19.

Alphonso relies on two cases in which the Ninth Circuit granted habeas relief to state prisoners who were precluded at trial from conducting

18

a full cross-examination of witnesses against them. [Doc. No. 1, pp. 37-38 (of 75), citing to *Holley v. Yarborough*, 568 F.3d 1091 (9th Cir. 2009) and *Fowler v. Sacramento County Sheriff's Dept.*, 421 F. 3d 1027 (9th Cir. 2005).] In both cases, the trial courts precluded the defense from cross-examining the victims about prior alleged statements for the purposes of impeaching their testimony. The Ninth Circuit granted a writ of habeas corpus in both cases, finding the limitation imposed on the scope of the cross-examinations abridged the defendants' rights under the Confrontation Clause. *Holley*, 568 F.3d at 1099-1100; *Fowler*, 421 F. 3d at 1041.

Unlike these cases, however, Alphonso does not allege his right to present a complete defense was abridged by a restriction on his ability to cross-examine the victim, but rather by the trial court's denial of the admission of extrinsic evidence and the denial of his motion for a new trial based on newly discovered extrinsic evidence. This case is more akin to *Nevada v. Jackson* (133 S.Ct. 1990 (2013)), in which the defendant unsuccessfully sought to introduce evidence for the purpose of showing the rape victim had previously reported to police the defendant had assaulted her, but the police were unable to substantiate the allegations. After exhausting his remedies in state court, he filed a federal habeas petition, arguing that the trial court's ruling violated his right to present a defense. Applying AEDPA's deferential standard of review, the District Court denied relief, but a divided panel of the Ninth Circuit reversed. *Jackson v. Nevada*, 688 F.3d 1091 (2012). The majority, relying on *Holley* and *Fowler*, held that extrinsic evidence of the victim's prior allegations was critical to the defense, and that the exclusion of that evidence violated his constitutional right to present a defense. *Id.*, at 1097–1101. The Supreme Court reversed, observing "[t]he Ninth Circuit elided the distinction between

cross-examination and extrinsic evidence by characterizing the cases as recognizing a broad right to present 'evidence bearing on [a witness'] credibility.'" *Jackson*, 133 S.Ct. at 1994 (*citation omitted*). The Court unambiguously stated "[the Supreme] Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Id.*, (emphasis original). In rejecting the broader interpretation of the constitutional right to present evidence bearing on witness credibility, the Court further remarked the Confrontation Clause is generally satisfied by the defense's opportunity to "expose [testimonial] infirmities through cross-examination." *Id.* (citation omitted). Alphonso does not contend he was denied that opportunity.

In turning to the state courts' review of Alphonso's claim he was denied the right to present a complete defense, the Court does not find that Alphonso has demonstrated this decision was contrary to, or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented. The Court of Appeal noted that although the trial court found Michelle's estranged husband to be "a highly credible witness," it also found that "his testimony 'doesn't frankly establish false allegations of any substance at all.'" (Lod. 6, p. 25.)  The Court of Appeal then weighed the probity of the extrinsic evidence regarding Michelle's prior domestic violence allegations in relation to the strength of her testimony, the corroborative testimony of her therapist and Officer Sdringola, and the photographic evidence of her injuries. (*Id.*, pp. 30-31.)  After weighing the evidence, the Court of Appeal concluded Alphonso failed to meet his burden of showing it was probable the new evidence would have resulted in a different result at retrial and, accordingly, his constitutional right to

/ /

present a defense was not abridged. (*Id.*, p. 31.) The Court does not find this decision to be objectively unreasonable.

### 5.    Claim 3 – Prejudice

Alphonso raises, as a separate claim, that the prejudice of any constitutional error arising from the denial of his motion in limine and his motion for a new trial should be assessed under *Chapman v. California*, 386 U.S. 18 (1967).  In habeas proceedings, a federal court applies the harmless error standard of *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) to constitutional error by the state courts, rather than the "harmless beyond a reasonable doubt" standard of *Chapman. See Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 2328 (2007) (stating that, "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*," a federal habeas court "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Under *Brecht*, "the standard for determining whether habeas relief must be granted is whether the . . . error 'had substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht*, 507 U.S. at 623, 637 (quoting and adopting the harmless error standard established in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The *Brecht* harmless error analysis "protects the State's sovereign interest in punishing offenders and its 'good-faith attempts to honor constitutional rights.'" *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (*quoting Brecht*, 507 U.S. at 635). The judge asks directly, "'Do I, the judge, think that the error substantially influenced the jury's decision?'"  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  If a federal habeas judge is in "grave

doubt" about whether a constitutional trial error "had substantial and injurious effect or influence in determining the jury's verdict," the error is not harmless and "the petitioner must win."  *O'Neal*, 513 U.S. at 436, 445.

Alphonso has failed to establish the denial of his motion in limine or motion for a new trial entailed constitutional error.  Even if it did, however, any such error did not have a "substantial and injurious effect or influence" on the trial.  *Brecht*, 507 U.S. at 623. The trial court conducted a hearing, pursuant to California Evidence Code § 402, during which it heard the testimony of Michelle's estranged husband. After hearing his testimony the court concluded it did not "establish false allegations of any substance at all." (Lod. 1, Vol 2, p. 412, lns. 12-14.) The court thus precluded the testimony because it would not provide the jury with any relevant facts and had no probative value. (Lod. 1, Vol 2, p. 412, lns. 15-18.)

AEDPA mandates this Court give deference to the trial court's findings of fact and presume them to be correct.  28 U.S.C. § 2254(e); *see also Sumner v. Mata*, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual findings of both state trial and appellate courts). Given that the trial court determined the testimony offered by Michelle's estranged husband did not establish she had made prior false allegations, and presuming this factual finding to be correct, the Court finds it is unlikely a jury would have reached a different conclusion and, as a result, would have rejected or discounted the testimony Michelle gave regarding the acts for which Alphonso was charged and convicted. Furthermore, as noted by the Court of Appeal, the probity of the estranged husband's testimony was outweighed by the strength of Michelle's testimony, the corroborative testimony of her therapist and Officer Sdringola and the photographic evidence of her injuries.  The Court, therefore, does not find the trial court's preclusion of the estranged husband's testimony had a substantial or

injurious effect or influence in determining the jury's verdict, or would have yielded a different result at retrial.

## C.   Claim 4, Denial of *Batson/Wheeler* Motion

In his fourth claim, Alphonso contends the trial court erred when it did not find the prosecutor improperly used peremptory challenges to exclude all non-white jurors. [Doc. No. 1, pp. 41-45.]

### 1.   Background

The following facts relevant to Alphonso's fourth claim are taken from the California Court of Appeal opinion:

> During voir dire – after the prosecutor exercised seven peremptory challenges to excuse jurors 9, 15, 11, 7, 22, 26, and 8 in that order – Alphonso's counsel requested a sidebar conference. Outside the presence of the prospective jurors, defense counsel complained that the prosecutor had used peremptory challenges to remove "every minority juror that's been on the panel so far." Defense counsel then stated: "Granted that I don't have African[-]Americans or Hispanics, but I pretty much have one of everything. They have pretty much all been removed by [*sic*] the panel. My client is not a minority himself. The first p[ere]mptory was of Middle Eastern descent. The one African[-]American was removed. The one Hispanic was removed. Right now everybody's that's basically left is Caucasian."
>
> The prosecutor, Claudine Ruiz, responded that she was a female Hispanic and that she did not recall anyone's racial makeup except for the African-American juror, prospective juror 11. The prosecutor stated, "I did not note any other juror as being Hispanic."
>
> Defense counsel replied that prospective juror 8 was Hispanic. The court stated "My notes reflect that as I couldn't tell," and the prosecutor said, "I have no idea." The court then indicated it would look at the prospective jurors' names, stating that "that's a risky venture to begin with." The prosecutor agreed, stating "Especially since we didn't use the names at all, and I didn't look at the names."
>
> After noting that "[d]etermining ethnic origin by itself is frequently fraught with mistakes," the court reviewed the prosecutor's use of peremptory challenges in the order those seven challenges were made. The court stated that, based on the name "Sabha," <u>prospective juror 9</u> "may well be... of Middle Eastern origin"; but then stated, "I'm not sure that's a minority." The court found  <u>prospective juror 15</u> was a Caucasian male, and <u>prospective juror 11</u> was an African-American male. Next the court found <u>prospective juror 7</u> was a Caucasian female;

prospective juror 22 "appeared... to be a Caucasian female"; prospective juror 26 "appeared... to be a Hispanic male," whose last name "Rivera" "appear[ed] to be consistent with a Hispanic male"; and prospective juror 8 "appeared" to be a Caucasian or Hispanic male whose "last name of Caravantes would appear to be of Hispanic origin." The court noted that Alphonso appeared to be Caucasian and his last name "would be consistent with that."[7] The court asked the prosecutor whether she had anything to add to her previous comments, and the prosecutor replied, "I guess, at this point, I'll wait."

### 1. *Ruling*

The court overruled the defense's *Batson/Wheeler* objection, finding there had not been a "pattern of systemic exclusion of any minority." The court observed that "other than the third peremptory challenge to [prospective juror] number 11, who we all agree is African[-]American, all the rest are to some extent risky in terms of characterizing their ethnic origin." The court noted there was a pair of jurors with Hispanic surnames that "appear[ed] to be consistent with [their] visual appearance,' but then stated, "[A]t this point, the court doesn't believe there's been a prima facie case made for the systemic exclusion of individuals of any particular origin or group."

[7]    The probation officer's report states Alphonso is "White."

(Lod. 6, pp. 11-13.)

## 2.    The California Court of Appeal Decision

The California Supreme Court denied Alphonso's *Batson/Wheeler* claim without citation of authority, so this Court must "look through" that denial to the Court of Appeal's opinion. *Ylst*, 501 U.S. at 801-806. The Court of Appeal addressed the  *Batson/Wheeler* claim as follows:

"Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity." (*People v. Davis* (2009) 46 Cal. 4th 539, 582 (*Davis*), citing *Batson, supra*, 476 U.S. at p. 97 & *Wheeler, supra*, 22 Cal. 3d at pp. 276-277.)

A rebuttable presumption exists that a prosecutor has exercised his or her peremptory challenges in a constitutional manner, and the burden is on the objecting defendant to demonstrate impermissible discrimination. (*People v. Dement* (2011) 53 Cal. 4th 1, 19; *People v. Cleveland* (2004) 32 Cal. 4th 704, 732 (*Cleveland*).)

The California Supreme Court has explained that when the defense raises a timely *Batson/Wheeler* challenge to the prosecutor's use of peremptory challenges, a three-stage

procedure applies: "'*First*, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an *inference of discriminatory purpose*." [Citation.] *Second*, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] *Third*, "[i]f a race-neutral explanation is tendered, the trial court must then decide... whether the opponent of the strike has proved purposeful racial discrimination."'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 786, quoting *Johnson v. California* (2005) 545 U.S. 162, 168, italic added.)

Regarding the first stage of *Batson/Wheeler* error analysis, the high court has clarified that, "[t]o make a prima facie showing of group bias, 'the defendant must show that under the totality of the circumstances *it is reasonable to infer discriminatory intent*.'" (*Davis, supra*, 46 Cal.4th at p. 582, italics added.)

If the defendant meets his or her burden of making a prima facie showing of group bias under this "reasonable inference" standard, "[t]he proper focus of a *Batson/Wheeler* inquiry... is on the subjective *genuineness* of the race-neutral reasons given [by the prosecution] for the peremptory challenge, *not* on the objective *reasonableness* of those reasons. [Citation.] So, for example, if a prosecutor believes a prospective juror with long, unkempt hair, a mustache, and a beard would not make a good juror in the case, a peremptory challenge to the prospective juror, sincerely exercised on that basis, will constitute an entirely valid and *nondiscriminatory* reason for exercising the challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) "All that matters is that the prosecutor' reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." (*Ibid.*)

The prosecutor's explanation need not rise to a level that justifies the exercise of a challenge for good cause. (*People v. Williams* (1997) 16 Cal.4th 635, 664.) "[A]dequate justification by the prosecutor may be no more than a "hunch" about the prospective juror [citation], so long as it shows that the peremptory challenges were exercised for reasons other than the impermissible group bias and not simply as "a mask for race prejudice."" (*Ibid.*)

1.   *Standard of review*

When a trial court denies a *Batson/Wheeler* objection based on its finding that no prima facie case of group bias was established, the reviewing court considers the record of the voir dire and affirms the ruling if it is supported by substantial evidence. (*People v. Jenkins* (2000) 22 Cal.4th 900,993.) The reviewing court "accord[s] particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand." (*Id.* at pp. 993-994.)

C.   *Analysis*

Having reviewed the record of the voir dire, we conclude substantial evidence supports the court's ruling that the defense failed to meet its threshold burden under *Batson/Wheeler* of making a prima facie case of impermissible group bias discrimination.

We begin our analysis by noting that Alphonso faults the court for overruling his objection to the prosecution's use of peremptory challenges to exclude four "minority jurors" (prospective jurors 9, 11, 27 & 8),[8] thereby suggesting that "minority jurors" is a cognizable group for purposes of *Batson/Wheeler* error analysis. The California Supreme Court has held that "'people of color'" is not a cognizable group for purposes of *Batson/Wheeler* analysis. (*Davis, supra,* 46 Cal.4th at p.583.) By parity of reasoning, "minority jurors" also is not a cognizable group for purposes of *Batson/Wheeler* analysis.

Jurors with Hispanic surnames, however, are a cognizable group for *Batson/Wheeler* purposes "even when 'no one knows at the time of challenge whether a particular individual who has a Spanish surname is Hispanic.'" (*Davis, supra,* 46 Cal.4th at p. 584.)

Here, the prosecutor (Ruiz) stated during the sidebar conference that she did not look at the jurors' surnames. The prosecutor also said she was Hispanic, and she did not "recall anyone's racial make[]up" with the exception of prospective juror 11, who she identified as "the African[-]American." The prosecutor added that she "did not note any other juror as being Hispanic." When defense counsel replied that Prospective Juror 8 was Hispanic, the prosecutor stated, "I had no idea."

The court appeared to share the prosecutor's views, stating that – apart from the prospective juror who they all agreed was African-American – "all the rest are to some extent risky in terms of characterizing their ethnic origin." The court indicated it thought prospective juror 26 could be Hispanic based on his surname; and stated that prospective juror 8 "may be a Hispanic male" although the court's notes "reflect[ed] the person appeared to be Caucasian or Hispanic."

Significantly, the record shows that defense counsel only identified Prospective Juror 8 as a Hispanic; he did not identify prospective juror 26 as a Hispanic.

The California Supreme Court has explained that although the exclusion of a single prospective juror may be the product of an improper group bias, "[a]s a practical matter... the challenge of one or two jurors can *rarely* suggest a *pattern* of impermissible exclusion.'" (*People v. Bell* (2007) 40 Cal.4th 582, 598, first italics added.)

26

Given the foregoing record of the sidebar *Batson/Wheeler* proceeding and the presumption that the prosecutor exercised her peremptory challenges in a constitutional manner (*Cleveland, supra,* 32 Cal.4th at p. 732), we conclude the court did not err in finding Alphonso failed to make the requisite prima facie showing that it is reasonable to infer that the prosecutor acted with discriminatory intent or purpose in using her peremptory challenges to excuse prospective jurors 9, 11, 26, and 8. (See *Davis, supra,* 46 Cal. 4th at p. 582.)

In support of his claim that he did make the requisite prima facie showing, and relying on *Bell, supra,* 40 Cal.4th 582, Alphonso faults the court for failing to consider (1) whether the challenged jurors only shared the characteristic of membership in a protected group, and (2) whether the prosecutor failed to engage the subject jurors in more that "desultory voir dire" or to ask them any questions at all. Alphonso's reliance on *Bell* is unavailing.

In *Bell*, the California Supreme Court identified three nonexclusive[9] types of relevant evidence (which Alphonso refers to as *"Bell* factors") that a defendant may use to establish a prima facie case for purposes of *Batson/Wheeler* error analysis: (1) evidence that the prosecutor "has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group"; (2) evidence that "the jurors in question share only this one characteristic – their membership in the group – and that in all other respects they are as heterogeneous as the community as a whole"; and (3) evidence that "his opponent [failed] to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all." (*Bell, supra,* 40 Cal.4th 597.)

Alphonso complains that "[n]o analysis of the *Bell* factors was undertaken" and the court erroneously failed to consider any of the three types of evidence (discussed, *ante*) identified in *Bell*. However, *Bell* does not *require* a trial court to consider the three types of evidence in determining whether a defendant has satisfied his or her burden of establishing a prima facie case. The language in *Bell* is permissive and only pertains to the types of evidence on which a *defendant* "may" properly rely as proof of a prima facie case for purposes of *Batson/Wheeler* error analysis.[10] (*Bell, supra,* 40 Cal.4th 597.)

Here, the record shows that during the sidebar conference, Alphonso's counsel only relied on the first type of relevant evidence identified in *Bell* – evidence that the prosecutor "ha[d] struck most or all of the members of the identified group from the venire, or ha[d] used a disproportionate number of his peremptories against the group" (*Bell, supra,* 40 Cal.4th at p. 597) – by arguing that the prosecutor had used peremptory challenges to remove "every minority juror that's been on the panel so far." Defense counsel did not rely on the second and third types of evidence identified in *Bell*. That the court considered defense counsel's argument

is implicitly shown by the fact that the court proceeded to review all seven of the prosecutor's peremptory challenges. We conclude the court did not err by failing to sua sponte consider the second and third types of evidence identified in *Bell*.

In support of his claim that the court incorrectly concluded he had failed to make a prima facie case, Alphonso discusses the voir dire responses of the excluded jurors, and concludes that the only thing that set those jurors apart from the other jurors then on the panel was their membership in a protected class. To the extent Alphonso is asking this court to engage in a comparative analysis of the challenged jurors and those who were then on the panel and ultimately served, we decline to do so because the court properly determined that Alphonso failed to make a prima facie case of purposeful discrimination. In *People v. Bonilla* (2007) 41 Cal.4th 313 – a "first stage" *Wheeler/Batson* case in which the trial court overruled the defendant's *Wheeler/Batson* objections after concluding he had failed to make out a prima facie case that the prosecutor was engaged in impermissible discrimination – the California Supreme Court upheld the trial court's ruling and stated, "Whatever use comparative juror analysis might have in a third-stage case for determining whether a prosecutor's proffered justifications for his strikes are pretextual, it has little or no use [in a first-stage case] where the analysis does not hinge on the prosecution's actual proffered rationales, and we thus decline to engage in a comparative analysis." (*Bonilla*, at pp. 341, 350.) Here, the case before us is also a "first-stage" *Wheeler/Batson* case and, as in *Bonilla*, comparative juror analysis "has little or no use" because "the analysis does not hinge on the prosecution's actual proffered rationales." (*Id.* at p. 350.)

Alphonso also complains that the prosecutor did not ask any questions of the challenged jurors. However, that the prosecutor did not ask the challenged jurors questions individually is of little importance because, as the Attorney General correctly points out, the record shows the prosecutor was able to obtain information about the jurors and observe their demeanor when the court and defense counsel questioned them. (See *People v. Dement, supra,* 53 Cal.4th at p. 21.)

We conclude the court properly determined that Alphonso failed to make a prima facie case of *Wheeler/Batson* error; that is, a showing that under the totality of the circumstances it is reasonable to infer that the prosecutor acted with discriminatory intent when she used her peremptory challenges to excuse prospective jurors 9, 11, 26, and 8. (See *Davis, supra,* 46 Cal.4th at p. 582.)

[8]     As noted, *ante*, the record shows that when defense counsel made his *Batson/Wheeler* objection, the prosecutor had also used peremptory challenges to exclude three Caucasian prospective jurors (prospective jurors 15, 7 & 22).

[9]     The non exclusivity of the three types of relevant evidence mentioned in *Bell* is

shown by the high court's statement that, "[t]hough proof of a prima facie case may be made from any information in the record available to the trial court, we have mentioned 'certain types of evidence that will be relevant for this purpose.'" (*Bell, supra,* 40 Cal.4th at p. 597, quoting *Wheeler, supra,* 22 Cal.3d at p. 280.)

[10]   Alphonso's reference to the types of relevant evidence identified in *Bell* – upon which a *defendant* may properly rely as proof of a prima facie case of *Batson/Wheeler* error – as "*Bell* factors" inappropriately suggests they are factors a trial court must consider when conducting a *Batson/Wheeler* error analysis, such that failure to consider them constitutes error.

### 3.   Claim 4 – *Batson/Wheeler*

Alphonso's *Batson/Wheeler* claim here is narrower than the claim he made to the Court of Appeal. Here, he contends the trial court committed constitutional error when it found defense counsel did not make a prima facie showing the prosecutor acted with discriminatory intent in exercising four peremptory challenges against non-white jurors and the California Court of Appeal erred in its conclusion otherwise. [Doc. No. 1, pp. 43-45 (of 75).]

Under the Equal Protection Clause, a litigant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's race, ethnic origin, or gender.  *See, e.g., Batson*, 476 U.S. at 85 (race); *Hernandez v. New York*, 500 U.S. 352 (1991) (ethnic origin); *J.E.B. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (gender).  As articulated by the Court of Appeal, courts employ a three-step process to determine whether the use of a peremptory challenge infringes *Batson* or its progeny:  First, a defendant must make a prima facie showing the challenge was based on an impermissible basis, such as race or gender.  Second, if that showing has been made, the prosecution must provide a race- or gender-neutral basis for striking the juror in question.  Third, if the prosecutor offers such an explanation, the trial court must decide whether the defendant has proved the prosecutor's motive for the strike was purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 476-77 (2008); *Green v. LeMarque*, 532 F.3d 1028, 1029-30 (9th Cir. 2008).

At the first step of a *Batson* challenge, which is the step that was the subject of the Court of Appeal's analysis, a defendant makes a prima facie showing if "(1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory strike to remove the juror and (3) the totality of the circumstances raised an inference that the strike was on account of race."  *Aleman*, 723 F.3d at 982 n.5 (citing *Crittenden v. Ayers*, 624 F.3d 943, 955 (9th Cir. 2010)).

I.   The Court of Appeal's Holding That "Minority Jurors" Is Not a Cognizable Group for Purposes of a *Batson/wheeler* Analysis Is Neither Contrary To, Nor an Objectively Unreasonable Application Of, Clearly Established Supreme Court Law

There is no Supreme Court law expressly addressing the issue of whether non-white jurors, or "people of color," is a cognizable group for purposes of a *Batson* analysis.[6] Because there is no clearly established Supreme Court law addressing this specific issue, the Court of Appeal's decision could not have been contrary to, nor involved an objectively unreasonable application of, clearly established Supreme Court law. *See, e.g., Knowles v. Mirsayance*, 556 U.S. 111, 122, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009) (holding that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court"); *Wright v. Van Patten*, 522 U.S. 120, 128 S.Ct. 743, 746–47, 169 L.Ed.2d 583 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law."(internal quotation marks omitted)); *Musladin*, 549 U.S. at 77 ("Given the lack of holdings from this Court regarding" the claim, "it cannot

---

[6] In the context of *Batson* challenges, African-Americans (*Batson*, 476 U.S. at 89), Latinos (*Hernandez*, 500 U.S. at 355, and both men and women (*J.E.B*, 511 U.S. at 143), among others, have been found to constitute "cognizable groups."

be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" (alterations in original)).

The Court finds that the Court of Appeal's decision that "minority jurors" are not a cognizable group for purposes of a *Batson/Wheeler* analysis does not contradict these authorities or involve an objectively unreasonable application of them. The Court finds that, at the very least, fairminded jurists could disagree regarding whether the decision was correct. *Pinholster*, 131 S.Ct. at 1426; *see also Gill v. Ayers*, 342 F.3d 911 (9th Cir.2003) ("[i]t is logical to conclude that if a case presents an issue close enough for reasonable minds to differ, then a state court's decision resolving that issue, even if incorrect, would not be objectively unreasonable.")

ii.   The Court of Appeal's Determination That Alphonso Failed to Make a Prima Facie Showing the Prosecutor Exercised Peremptory Challenges Based on Race Was Not an Unreasonable Determination of the Facts

After rejecting Alphonso's claim based on the striking of "minority jurors," the Court of Appeal considered the peremptory challenges of prospective jurors 8 and 26, both of whom were identified by the trial court as possibly being Hispanic. "A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2)." *Id.* at 1224.  Therefore, the state court's decision will be upheld unless it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at 1225 (quoting 28 U.S.C. § 2254(d)(2)).  Indeed, in evaluating habeas petitions premised on a *Batson* violation where the trial court's credibility finding was affirmed by the state court of appeals, the standard is doubly deferential. *Id.* (internal quotation marks omitted).  "One level of deference arises from the broad power of a

trial court to assess credibility of the prosecutor's statements that were made in open court.  Another level of deference arises from the AEDPA context where we defer to state court decisions that are not objectively unreasonable."  *Aleman*, 723 F.3d at 983.

As described above, the third component of the first step of the *Batson* analysis requires the petitioner show that "the totality of the circumstances raises an inference that the strike was on account of race." *Crittenden*, 624 F.3d at 955.  Here, the "totality of the circumstances" does not raise an inference the prosecutor's striking of prospective jurors 8 and 26 was on account of race.  At the time Alphonso's *Batson/Wheeler* motion was made the prosecutor had exercised a total of seven peremptory challenges. Only two of the seven prospective jurors who were struck are identified as being Hispanic. In comparison, three of the seven are identified as Caucasian.[7] Furthermore, the prosecutor, who is also Hispanic, stated she did not recall the racial make-up of any of the prospective jurors, except for the sole African-American juror. (Lod. 1, Vol. 1 of 3, p.162, lns. 3-14.) She also stated she did not look at the prospective jurors' surnames. (*Id.*, lns. 8-9.) The trial court's perception of the prospective juror pool appears to be in line with the prosecutor's. The court stated that apart from the one prospective juror who everyone agreed was African-American, determining the ethnic origin of the other prospective jurors was "a risky venture" that is "fraught with mistakes." *Id.*, lns. 5-23.) The transcript of the sidebar hearing regarding Alphonso's *Batson/Wheeler* motion indicates the racial background of prospective jurors 8 and 26 could not be readily discerned based on their appearance. For example, prospective juror 8 was identified by Alphonso's counsel as Hispanic, but the court stated "[m]y notes reflect that as I couldn't tell," and the

---

[7] Prospective jurors 15, 7 and 22 are identified as Caucasian.

prosecutor said "I did not note him at all as being any race." (*Id.*, lns. 1-14.) The racial background of prospective juror 26 appears to be just as unclear, if not more so. Significantly, Alphonso's counsel only identified prospective juror 8 as Hispanic and did not identify prospective juror 26 as such.  The determination this individual might be Hispanic for purposes of the *Batson/Wheeler* analysis was only made by the trial court during the sidebar conference, after review of his surname.  Thus, given the totality of the circumstances, the Court finds the Court of Appeal did not err in its conclusion that Alphonso failed to make a prima facie showing of *Batson/Wheeler* error with respect to the prosecutor's peremptory challenges of prospective jurors 8 and 26, and that its conclusion was not an unreasonable determination of the facts in light of the evidence presented.

## V.   RECOMMENDATION

After a thorough and independent review of the record in this matter, the undersigned Magistrate Judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards. Therefore, this Court hereby recommends that the petition be DENIED WITH PREJUDICE and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable M. James Lorenz, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

IT IS ORDERED that no later than **August 28, 2015**, any party may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be served and filed no later than **September 8, 2015**.  The parties are advised

1  that failure to file objections within the specified time may waive the right to

2  raise those objections on appeal of the Court's order.  *See Turner v.*

3  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153

4  (9th Cir. 1991).

5

6  DATED:  August 12, 2015

7

8  Jan M. Adler
   U.S. Magistrate Judge

34